CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
November 19, 2024
LAURA A. AUSTIN, CLERK
BY: s/A. Beeson
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RANDY LEE LASSITER, JR., ) | |
|     Plaintiff, ) | Civil Action No. 7:23cv00650 |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| CORR. OFFICER BLEVINS, et al., ) | By:  Robert S. Ballou |
|     Defendants. ) | United States District Judge |

Randy Lee Lassiter, Jr., a Virginia inmate proceeding *pro se*, has filed a civil rights complaint against the defendants under 42 U.S.C. § 1983.  The served corrections defendants[1] have filed a Motion to Dismiss or in the Alternative to Sever.  Lassiter has responded in opposition to the motion and has filed a motion for counsel.

Lassiter's Amended Complaint asserts claims against various combinations of defendants for a series of incidents at Wallen's Ridge State Penitentiary on August 3, 2023; August 16, 2023; August 19, 2023; August 30, 2023; September 12, 2023; September 19 - 23, 2023; September 26, 2023; October 9, 2023; October 11, 2023; and October 9 – November 15, 2023.  He has also alleged claims for incidents at Pocahontas State Correctional Center between March 17 – 24, 2022.  His Amended Complaint reads like a stream-of-consciousness recital of every perceived slight combined with the certainty that such slights were intentional and malevolent.

Along with his Motion for Appointment of Counsel, Lassiter has provided an affidavit saying, among other things, that "This case is complex because it contains several different legal claims, with each claim involving a different set of defendants."  Lassiter Aff., ECF No. 67-2.

---

[1] In his initial Complaint, Lassiter identified four corrections employees (Blevins, Coleman, Boyd, and McCracken) and two medical personnel (Scalf and pill nurse, later identified as Gilley).  Lassiter's Amended Complaint arrived after Notice of Service of the original complaint had been sent, but before waivers of service were due.  The Amended Complaint added several new claims and new defendants.  The additional defendants have not been served, for reasons that will become clear in this opinion.

Truer words have not been spoken. That, however, is at the heart of defendants' Motion to Sever. Under the Federal Rules of Civil Procedure, one may join several different parties as defendants "*only* if the claims against all defendants arose out of the same incident or incidents *and* involve a common factual or legal question." *Green v. Denning*, 2009 WL 484457, at *2 (D. Kan. Feb. 26, 2009) (emphasis added) (discussing Rule 20, FED. R. CIV. P.). Claims occurring on different dates and involving different people belong in separate lawsuits. Claims involving different people and occurring at different locations belong in different lawsuits. Misjoinder of such claims in a single proceeding produces a morass of complications, difficult not only for a *pro se* litigant, but also for lawyers, courts, and jurors. That is why rules against misjoinder exist.

Courts have recognized another reason that misjoinder of claims is problematic in prisoner litigation: Allowing a plaintiff to combine claims for different events, arising from different factual situations at different times and places, flies in the face of the letter and spirit of the Prison Litigation Reform Act (PLRA). The PLRA requires payment of the full filing fee for any civil rights action submitted by a prisoner but allows partial payments to be withheld from the inmate's trust account, unless the inmate falls under the "three-strike rule," meaning he has had three or more cases previously dismissed as frivolous, malicious, or failing to state a claim for which relief could be granted, in which case, the full fee must be paid up front. *See* 28 U.S.C. §§ 1915(g) and 1915A. "Congress enacted the PLRA with the principal purpose of deterring frivolous prisoner litigation by instituting economic costs for prisoners wishing to file civil claims." *Lyon v. Krol*, 127 F.3d 763, 764 (8th Cir. 1997). Requiring compliance with the rules against misjoinder prevents prisoners from skirting around the fee obligations and the three-strike rule. *Green*, 2009 WL 484457, at *2.

Lassiter has clearly joined several unrelated claims in his lawsuit, violating the misjoinder rules. Misjoinder of defendants is not grounds for dismissal, however. The court may choose to drop defendants or to sever unrelated claims. FED. R. CIV. P., Rule 21.

The court must dismiss claims that do not allege facts showing that the plaintiff is entitled to relief if those facts are true. Legal conclusions, labels, conclusory statements, and "formulaic recitation of the elements of a cause of action" are not sufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This requires the court to examine each claim alleged by Lassiter to determine whether the complaint states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### **Lassiter's Claim 1**

Lassiter alleges that he was assaulted by gang members on August 3, 2023, who kicked, stomped, and choked him, causing visible injuries (contusions) and painful injuries (muscle strains). Lassiter alleges that he informed Officer Blevins that gang members were calling him a snitch, taking his property, and threatening to assault him, but Blevins took no action to protect him, showing gross negligence and deliberate indifference. Am. Compl., Claim 1, at 5-6, ECF No. 27.

He also alleges that earlier that morning, he told Lt. Coleman and Unit Manager Boyd that he needed to be moved out of the pod before he went to school because he was in fear for his life. They told him to talk to Classifications Administrator Church about his concerns. Lassiter does not indicate whether he followed those instructions, but formulaically alleges that Coleman and Boyd were grossly negligent and deliberately indifferent to his needs. *Id.*

Following the assault, Lassiter alleges that he immediately told Officer Blevins of the assault and requested medical treatment, but Blevins took no action to assist him, again showing

gross negligence and deliberate indifference to his needs, in violation of the Fifth, Fourteenth, and Eighth Amendments. Likewise, Lassiter states that he spoke to the pill nurse (defendant Gilley), who advised that he would be called to medical, but he was never called. He alleges that she was also deliberately indifferent. *Id.*

The court construes this claim as a claim against Blevins, Boyd, and Coleman for failure to protect him and a claim against Blevins and Gilley for failure to provide medical treatment. Because both claims arise out of the alleged assault on Lassiter on August 3, they are properly joined together. At the outset, the court will clarify that both claims arise under the Eighth Amendment, not the Fifth and Fourteenth. The Eighth Amendment prohibits the infliction of cruel and unusual punishment. Inmates are housed with other criminals, many of whom are violent, and prisons strip inmates of most means of self-protection; allowing prisoners to assault, batter, and maim one another serves no legitimate penological purpose, and therefore amounts to cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Similarly, inmates lack the ability to leave the prison and seek their own medical care, and lack of medical care may cause unnecessary pain and suffering which serves no penological purpose. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference is the standard adopted by the court to impose liability on prison officials for violation of Eighth Amendment rights. *Id.* at 104.

To establish deliberate indifference, the plaintiff must allege facts sufficient to meet a two-prong test: (1) the existence of an objectively significant injury or substantial risk thereof and (2) a defendant's sufficiently culpable state of mind, which requires allegations suggesting that the defendant was subjectively aware of facts from which he actually inferred knowledge of the injury or risk, yet took no reasonable action to address it. *Raynor v. Pugh*, 817 F.3d 123, 127–28 (4th Cir. 2016). As defined by the Supreme Court, deliberate indifference is more than

4

mere negligence, but less than purposefully or knowingly causing harm. *Farmer*, 511 U.S. at 835. It is similar to subjective recklessness as defined in criminal law. *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). While the burden of proving that a defendant subjectively knew the risk of a serious injury to plaintiff sounds difficult, the Court has noted that:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that a risk was obvious.

*Farmer*, 511 U.S. at 842.

In claim 1, the only failure to protect claim that Lassiter has come close to stating is against Officer Blevins, but even those allegations are lacking in detail. He alleges that he told Officer Blevins he was about to be attacked and assaulted because gang members were calling him a snitch. He does not state whether he pointed out the gang members who were threatening him or identified them in some other way. He says Blevins did not do anything about it when the gang members took his television, but he does not say whether Blevins was present when that occurred, whether he saw it happen, or when it happened in relation to the assault. Lassiter describes a fairly brutal assault, which meets the first prong of the test, risk of serious injury. Where he falls short is the lack of facts from which one could infer that Blevins subjectively knew that there was a real risk of a serious assault. He does not say where Blevins was when the attack occurred, nor does he provide any information from which one could infer that he knew the risk of danger before Lassiter told him the assault had occurred.

Lassiter's allegations against Coleman and Boyd provide even less. He alleges he told them he feared for his life and wanted to be moved to a new pod before he went to school. He

5

does not say whether he told them why he feared for his life nor whether he identified the inmates he feared. As one court noted, one of the most difficult aspects of managing a prison is determining "who is actually at risk of being harmed and who is simply taking advantage of a dangerous environment to manipulate a change in housing status." *Thompson v. Shearin*, No. PJM-11-428, 2011 WL 5118411, at *4 (D. Md. Oct. 26, 2011). "I fear for my life," without more detail, does not provide the kind of information needed for an official to respond to a threat. Further, Coleman and Boyd advised Lassiter to talk to Administrator Church about the situation if he was worried. Lassiter does not indicate whether he followed that advice. Either way, their response to him was reasonable, based upon the information known to them. A prison employee is not liable if he responded reasonably to the risk of which he knew. *Farmer*, 511 U.S. at 842.

In alleging deliberate indifference to his medical needs, Lassiter has not alleged sufficient facts. His only allegation against Nurse Gilley is that she said he would be called to medical, but he was not called. What he has provided no information about is why he was not called. Was he called on a later date than he expected? Was the doctor overbooked already? Did the nurse simply forget by the time she finished her pill rounds? He has not provided information supporting anything more than mere negligence, at most. In recognizing the Eighth Amendment right to medical care, the Supreme Court was careful to emphasize that "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. To show deliberate indifference, an inmate must show subjective awareness of an objective risk of serious physical harm, just as in the failure to protect context. Lassiter has not alleged any facts from which one could infer that Nurse Gilley had such a culpable state of mind.

Lassiter also alleges that Officer Blevins was deliberately indifferent for failing to get medical care for him. From the facts alleged, however, it seems like Lassiter talked to Blevins

and Nurse Gilley immediately after the attack, and Nurse Gilley told him that medical would call him.  Prison officials are entitled to rely on the professional judgment of trained medical professionals.  *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990), *overruled on other grounds by Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124 (4th Cir. 2020).  Seeing Lassiter speak with the Nurse would suggest that Blevins saw that Lassiter was arranging for medical care, leaving nothing else for Blevins to do on that issue.

### Lassiter's Claim 2

Lassiter's "claim 2" is a potpourri of different claims, arising on different dates against different people, related only by their occurrence at Wallen's Ridge State Prison.  Lassiter states he complained to Nurse Scalf on August 16, 2023, about chest pain and difficulty breathing due to his asthma, plus chronic pain from the assault on August 3, 2023.  Nurse Scalf allegedly asked, "What am I supposed to do?" and he asked her to call him to medical.  He does not say whether he was called to medical but concludes that she was deliberately indifferent to his medical needs.  Am. Compl., Claim 2, at 5.

He alleges that he fell from his top bunk on August 16, 2023, and on August 19, Sgt. Cope and Officer McCracken unconstitutionally denied him medical attention when he was in extreme pain from falling from the top bunk three nights earlier, plus having chest pain, back pain, and shortness of breath. He told the pill nurse to call him to medical.  He called Classification Administrator Church, Unit Manager Boyd, and Lt. Coleman, and requested a cell change to a different unit and to be assigned to a bottom bunk in accord with his medical pass from Dr. Happy Smith.  Apparently, they failed to move him that day, because later that day, Lassiter says he tried to get into his top bunk by standing on a table, because there was no ladder.  He slipped and fell, hitting his head, and was knocked unconscious.  Sargent Cope removed

Lassiter from the cell, unconscious, and took him to medical. He alleges that all involved violated his Eighth Amendment rights by being deliberately indifferent to his needs until he fell and knocked himself unconscious. *Id.* at 7.

Next, Lassiter alleges that he was defamed by Coleman, Blevins, Pendleton, Young, and Boyd, after Lassiter filed a written complaint about the events discussed in the previous paragraph, and that *one of them* gave Lassiter's written complaint to a snitch on an unidentified date. Gang members were passing copies of his complaint around and trying to prevent Lassiter from filing a timely grievance. He further alleges that these five corrections employees told gang members Lassiter was a snitch, because they were trying to get Lassiter stabbed and killed. *Id.* When that did not work, Lt. Coleman moved Lassiter to the A Building, where he told another gang member that Lassiter was a snitch. Lassiter alleges that this conduct was in retaliation for his exercise of First Amendment rights, presumably filing the complaint or grievance, though he does not so state. *Id.*

In Building A, Lassiter alleges that Lt. Coleman housed him with a cell mate who was intellectually and behaviorally challenged. Lassiter says that the cell was "nasty and filthy," providing no other details, and that his cell mate was "trying to rape him." He told Officers Dougherty, McKenzie, and Wells on September 12, 2023, that he feared for his life because of his cell mate's behavior, but they were deliberately indifferent to his safety needs, violating his Eighth Amendment rights. At 8:53 p.m., he was screaming for help after he had to defend himself, and he couldn't breathe because of an asthma attack. He was also having back and chest pain, and he requested to go to medical. They just handcuffed him to his tray slot because they were retaliating against him, though he does not say what for. Lassiter then submitted a reassignment request to Unit Manager Santos, Lt. Pauly, Sgt. Lewis, Sgt. Berg, and

8

Classifications Administrator Church, stating he feared for his life and needed to be moved away from this cell mate. No action was taken until he filed a PREA complaint to the Warden and Assistant Warden the next day. *Id.* at 8.

These allegations should properly be the subject of at least five different lawsuits, because they involve different events, different dates, and different alleged wrongdoers, although one or two persons might be sued in more than one suit. Further, before filing such suits, Lassiter should ensure that he alleges facts sufficient to support his claims of deliberate indifference, unsanitary jail conditions, and retaliation.

This opinion's discussion of Claim 1 detailed the requirements for deliberate indifference, including a culpable state of mind. It is not enough to say that someone's actions are deliberately indifferent; a plaintiff must allege sufficient facts—not conclusions—from which a person could reasonably infer that the defendant was subjectively aware of a serious risk of harm to the plaintiff yet chose to do nothing. *Farmer*, 511 U.S. at 835.

Lassiter has failed to state a claim for retaliation. Retaliation claims in the prison setting are sometimes treated with skepticism by the courts "because every act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (en banc). The three elements of a First Amendment retaliation claim are (1) that the plaintiff engaged in protected First Amendment activity; (2) the defendants took some action that adversely affected the plaintiff's First Amendment rights; and (3) a causal relationship between the plaintiff's protected activity and the defendant's conduct. *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020). Again, a plaintiff must plead sufficient facts for a person to reasonably infer the causal relationship between plaintiff's protected activity and the defendant's conduct. A conclusory statement that "He did it to retaliate

9

against me" is insufficient. Mere proximity in time between plaintiff's activity and defendant's conduct is not sufficient to sustain a retaliation claim. *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993).

Lassiter's prison cell conditions claim is insufficient as pled because he has not identified the specific conditions that he found intolerable. "Nasty and filthy" is a description that conveys no objective facts. To constitute a constitutional violation, cell conditions must be such as to deprive an inmate of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To the extent that prison conditions are harsh, "they are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

### Lassiter's Claim 3

In claim 3, Lassiter combines two different claims alleging deliberate indifference to his medical needs. On September 17, 2023, he states that couldn't breathe and was having chest pains. Officers White and Comer refused to get him medical treatment all weekend, even when advised that he needed his inhalers.

On September 19, 2023, he complained of the same health issues, asthma and chest pain, but Officer Witt, Officer Taylor, Sgt. Sexton, Sgt. McCray, and Lt. Pauly were all deliberately indifferent. Even though Lassiter's alleged symptoms were the same as on September 17, different people were involved people and the date was different, so these allegations do not belong together in a single lawsuit. Lassiter says he asked his mother to call medical, and he alleges that Nurse Davis was rude to his mother and hung up on her. When Lassiter asked the booth officer to call medical, Lassiter was told that Nurse Davis said she was not worried about him, which he also alleges to be deliberate indifference. Incidentally, being rude to and hanging up on his mother is not a constitutional violation.

10

Lassiter next states that he told Lt. Pauly, directly into his body-worn camera, that he was being denied medical treatment. Lt. Pauly apparently arranged to get Lassiter to the medical department, because Lassiter then complains that Nurse Davis held him hostage in the medical department from September 19 to September 23. He had to sign a form refusing to stay in medical, because the Nurse wanted to keep him there for six months. This undermines the alleged deliberate indifference claim, as he was seen by the medical department. Patients do not have a constitutional right to the treatment of their choice. *King v. United States*, 536 F. App'x 358, 363 (4th Cir. 2013) (unpublished). If Lassiter did not want the evaluation and treatment offered by the prison medical staff, that is not the same as being deliberately indifferent to his needs.

## Lassiter's Claim 4

Lassiter alleges he requested an emergency grievance form or medical treatment on October 11, 2023, because he was experiencing chest pain, back pain, and shortness of breath. In response, Sgt. Bowen told him to go to security strip cell, and Lassiter asked why. He claims that Bowen then used excessive force by spraying him with mace, two times, less than five minutes apart, causing him to pass out and have an asthma attack.

He then states in a conclusory manner that Capt. McCray, Lt. Ferguson, Sgt. Fields, Sgt. Bowen, and the (unidentified) medical nurse were all aware that he needed his inhalers but were deliberately indifferent to his medical needs. These events involve different defendants than those named in the original Complaint, and the events occurred on a different date, and should be the subject of a separate Complaint, with proper factual allegations, if he wishes to pursue it.

**Lassiter's Claim 5**

In his claim 5, Lassiter begins with his transfer to the Restorative Housing Unit ("R.H.U.") on October 9, 2023, where he makes the conclusory claim that he was being retaliated against for exercise of his First Amendment rights. While in R.H.U., he was denied outside recreation, table recreation, and showers. He alleges that Officers Huff, Smith, and Giles put empty trays in his meal slot, so that video footage appeared to show him being fed, when he actually received no food. He does not provide sufficient factual data regarding the number of times this happened.

On some unspecified date, Lassiter went on suicide watch and was moved to another cell. He alleges that the cell had urine and feces all over it, and no one gave him cleaning supplies. However, he does not identify the person or persons who placed him in the cell. He does not say whether he asked for cleaning supplies, and if so, who denied them. He left the cell on November 15, 2023, when he was transferred to Red Onion State Penitentiary, in retaliation for his exercise of First Amendment rights.

On November 5, 2023, Officer Hacked denied Lassiter his dinner tray, and the next morning, Officer Broyles denied him his breakfast tray. Nurse Smith also passed his cell without giving him his medication at pill call, allegedly in retaliation for his grievances and lawsuits against the medical department.

If Lassiter is alleging that everything between October 9 and November 15, 2023, was retaliatory for his exercise of First Amendment rights, then perhaps these otherwise separate and discrete events could be included in a single Complaint. However, his factual allegations fall short of alleging facts from which one could infer a retaliatory motive for official actions.

### Lassiter's Claim 6

Lassiter alleges that Warden Artrip and Assistant Warden Blevins allowed him only one hour out of his cell on September 26, 2023. Further, he alleges that he was only allowed two hours of rec time Monday through Friday and one hour on the weekends while in the R.H.U., which violated his Eighth Amendment rights. "*Complete deprivation* of exercise for an extended period of time violates Eighth Amendment prohibitions against cruel and unusual punishment." *Mitchell v. Rice*, 954 F.2d 187, 191 (4th Cir. 1992) (emphasis added). However, Lassiter has not alleged complete deprivation of exercise. Courts have found prisons in compliance with the Eighth Amendment with less exercise available. *E.g., Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (finding no violation of rights by outdoor exercise limited to 45 minutes per week); *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (finding no violation of rights when exercise limited to one hour per week). Claim 6 fails to state a claim for which relief may be granted.

### Lassiter's Claim 7

Lassiter alleges that Warden Artrip and then-VDOC Director Clarke are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as supervisors acting with deliberate indifference and failing to provide proper training. Specifically, Lassiter seeks to hold Artrip and Clarke liable for the assault he suffered on August 3, 2023 and for being held in a cell with urine and feces and no cleaning supplies.

In the context of § 1983 actions, the term "supervisory liability" is a misnomer. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior* or vicarious liability. *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023). Liability under § 1983 is personal,

13

based upon each defendant's personal violation of a plaintiff's constitutional rights. *Ahscroft*, 556 U.S. at 676. A claim for supervisory liability requires facts showing the following: (1) the supervisor's actual or constructive knowledge that his subordinate was engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference towards or tacit authorization of the subordinate's conduct; and (3) a causal connection between the supervisor's action or inaction and the constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Lassiter alleges that Artrip and Clarke "knew of dangerous conditions at Wallen's Ridge." Am. Compl., Claim 7, at 11. Knowing of dangerous conditions—whatever those might be—is not the same as knowing of misconduct by specific corrections officers. He alleges that he and his mother alerted "them" (presumably Artrip and Clarke) that Lassiter was in fear of his life and needed to be moved. Again, this does not show that Artrip and/or Clarke had any knowledge regarding how his subordinates investigated or otherwise responded to Lassiter's claimed fear. As indicated in the discussion of Claim 1, a statement that someone is in fear of his life, without more, is insufficient information for a supervisor to act. *Farmer*, 511 U.S. at 842. Likewise, without sufficient allegations to show deliberate indifference by the officers, there is no unconstitutional conduct for which the supervisor should be aware. *King*, 76 F.4th at 269. Without awareness of specific ongoing misconduct by the officers, there was nothing for Artrip and Clarke to behave indifferently towards.

Likewise, Lassiter has not alleged facts showing that Artrip and Clarke were aware that officers put Lassiter in a cell with urine and feces and no cleaning supplies. Nor are there allegations that placing inmates in such unsanitary cells was a documented, widespread practice,

14

such that Artrip and Clarke had constructive knowledge. Without facts sufficient to show such actual or constructive knowledge, a claim for supervisory liability fails.

The claim for improper training is conclusory. No facts are provided regarding the training provided or that should have been provided. Thus, the claim fails to state a cause of action for which relief is available.

Nor has Lassiter stated a *Monell* claim. In *Monell*, the Supreme Court held that municipalities could be held liable if execution or implementation of a municipality's policy statement, ordinance, regulation, decision, or custom (whether formally or informally adopted) causes the constitutional harm to the plaintiff. *Monell*, 436 U.S. at 690–91. This is another way of expressing that the defendant must have personal responsibility for the constitutional violation and injury. Clarke and Artrip are not municipalities, however. Their liability as supervisory personnel must be based upon the elements in *Shaw*.

Distinct from his claims against Artrip and Clarke, Lassiter alleges that *Monell* liability should be imposed on Nurse Townsend, Dr. Smith, and Dr. Mullins for their indifference because the medical department mishandled medical emergencies and because he did not see the doctor about his "extreme chronic pain," which was an ongoing issue. Lassiter notes that he filed multimer sick call requests, written complaints, and emergency grievances about his medical care, so they were aware of his condition and deliberately indifferent. Nurse Townsend, Dr. Smith, and Dr. Mullins are health care providers, not a municipality. Lassiter has not identified any individual subordinate to them who violated his rights, so supervisory liability does not apply.

In the discussion of Claim 1 earlier, the elements of a proper claim for medical indifference have been discussed. Lassiter has not alleged sufficient facts to show that his

15

chronic pain was an objectively serious condition, meaning that the chronic pain had been diagnosed by a physician as mandating treatment or that it was so obvious that a lay person would recognize the necessity for a doctor's attention. *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). He was seen by nurses, and his complaints were relayed to the doctor. That he desired more or different care than he was provided does not make the health care providers liable for a constitutional violation. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

### Lassiter's Claim 8

In claim 8, Lassiter raises several different incidents that occurred in 2022 at Pocahontas State Correctional Center, different time frame and different location from any of the other claims. He alleges that Officers Starcher, Denver, and Traitor used excessive force against him on March 17, 2022, bumping his head on the floor, punching and kicking him, and fracturing his middle finger. He states that this "unjustified ambush" was in retaliation for his exercise of free speech to complain about property being thrown away in his cell.

He alleges being housed in segregation in R.H.U. from March 17 through March 24, 2022, without any disciplinary charge. This allegation does not entitle him to relief under § 1983. There is no constitutional right for an inmate to be housed at a particular custody level or in a particular portion or unit of a correctional institution. *Pevia v. Hogan*, 443 F. Supp. 3d 612, 634 (D. Md. 2020). During his time in the R.H.U., he alleges that he lost the personal property from his regular cell because no one did an inventory list of his property, and he seeks compensation for what he lost. He has not identified a person responsible for either of these claims.

He alleges that Chief of Housing Kinzer held him in the R.H.U. for two months after the Department of Corrections granted Lassiter an override from Level 5 to Level 4, and he could

have been released to general population.  As noted in the previous paragraph, this states no constitutional claim.  Decisions on where to house inmates are "at the core of prison administrators' expertise."  *McKune v. Lile*, 536 U.S. 24, 26 (2002).  Courts must defer to a correctional system's need to maintain order, discipline, and control while trying to manage a volatile environment.  *Pevia*, 443 F. Supp. 3d at 635.  Lassiter also alleges that Kinzer sought to arrange a transfer to Wallen's Ridge in retaliation, though he does not say in retaliation for what.

Finally, he alleges that he was transferred to River North Correctional Center, where he was supposed to be, but Unit Manager Smith and Counselor Saunder "rigged his points up" and said he was a previously convicted violent offender; they asked the DOC to classify him as a level 5 and transfer him to Wallen's Ridge.  He was allegedly kept in R.H.U. from May 12, 2022, until June 10, 2022, though it is unclear if this occurred at Pocahontas State Correctional Center or at River North.  Again, security classification and housing decisions fall within the discretion of the DOC, and these allegations fail to state a claim for which relief may be granted.

## CONCLUSION

Lassiter has misjoined numerous different claims against different defendants, and most of his claims are not sufficiently pled.  The court will dismiss the following claims for failing to state a claim for which relief may be granted:  (1) Fifth and Fourteenth Amendment claims arising from the facts alleged on August 3, 2023 in Lassiter's claim 1; (2) all claims against Witt, Taylor, Sexton, McCray, Pauly, and Nurse Davis for events alleged on September 19, 2023, and September 19 – 23, 2023 in Lassiter's claim 3; (3) claims against Artrip and Blevins for inadequate exercise, as alleged in Lassiter's claim 6; (4) *Monell* claims against Artrip and Clarke in Lassiter's claim 7; (5) *Monell* claims against Dr. Smith, Dr. Mullins, and Nurse Townsend, as alleged in Lassiter's claim 7; (6) claim for being housed in RHU at Pocahontas State

Correctional Center without a disciplinary charge from March 17 through March 24, 2022; (7) claim for being housed in RHU for two months in 2022; and (8) claims for changing his security classification in 2022 and sending him to Wallen's Ridge State Penitentiary instead of North River Correctional Center. Recognizing that Lassiter is proceeding *pro se* and may benefit from the opportunity to properly file separate lawsuits with factually complete allegations, the court will dismiss his remaining claims without prejudice.

An appropriate order will be entered this date.

Enter: November 19, 2024

/s/ Robert S. Ballou

Robert S. Ballou
United States District Judge